Filed 11/13/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BRENNON B.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>WEST CONTRA COSTA UNIFIED SCHOOL DISTRICT et al.<br><br>        Real Parties in Interest. | A157026<br><br>(Contra Costa County Super. Ct. No. MSC1601005) |

**INTRODUCTION**

We are asked to decide two issues:  (1) whether a public school district is a business establishment for purposes of the Unruh Civil Rights Act (Civ. Code, § 51), and (2) even if a school district is not a business establishment, whether it can nevertheless be sued under the Unruh Act where, as here, the alleged discriminatory conduct is actionable under the Americans With Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.).  Both are issues of first impression in the California appellate courts.

Our Supreme Court has examined the meaning of the term "business establishment" as used in the Unruh Act in a number of cases.  However, the defendant in each was a private entity.  Thus, the court has had no occasion to consider whether a government entity, and specifically an agent of the

1

state performing a state constitutional obligation, such as a public school district, is a business establishment within the meaning of the Act.[1]

We have therefore followed the analytical template our high court has employed in deciding whether a private entity is a business establishment for purposes of the Act, examining the historical genesis of the Act and the Act's limited legislative history, and canvassing the court's decisions and considering the scholarly articles to which the court has regularly cited, as well as other pertinent authorities. This multi-pronged inquiry leads us to conclude public school districts are not business establishments under the Unruh Act.

We further conclude the Unruh Act imposes liability only on business establishments and therefore reject petitioner's alternative assertion that, even if a public school district is not a business establishment, it may nevertheless be held liable under the Act where, as here, the alleged discriminatory conduct is actionable under the ADA. Reading the language on which petitioner predicates his assertion in context, and in light of its legislative history and our high court's decisions discussing it, we conclude this language makes explicit that any violation of the ADA by a business establishment is also a violation of the Unruh Act.

---

[1] "Public education is an obligation which the State assumed by the adoption of the Constitution. [Citations.] . . . '[M]anagement and control of the public schools [is] a matter of state[, not local,] care and supervision. . . .' [Citations.] . . . Local districts are the State's agents for local operation of the common school system. . . ." (*Butt v. State of California* (1992) 4 Cal.4th 668, 680–681.) "The Constitution has always vested 'plenary' power over education not in the districts, but in the State, through its Legislature, which may create, dissolve, combine, modify, and regulate local districts at pleasure." (*Id.* at p. 688; accord *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1195.)

In reaching these conclusions, we are by no means suggesting our public school districts are not subject to stringent anti-discrimination laws. They are. These include the panoply of antidiscrimination statutes set forth in the Education Code and applicable to all schools receiving any form of state funding or assistance (Ed. Code, § 200 et seq.) and the comprehensive antidiscrimination provisions set forth in the Government Code and applicable to all government entities (Gov. Code, § 11135), as well as federal constitutional mandates (actionable under 42 U.S.C. § 1983), and statutes such as Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), Title II of the ADA (42 U.S.C. § 12131 et seq.), and section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).

We thus conclude the trial court did not err in sustaining the school district's demurrer to petitioner's cause of action under the Unruh Act without leave to amend, and therefore deny his petition for a writ of mandate (Code Civ. Proc., § 1085) challenging that ruling.

## DISCUSSION[2]

### *Historical Background of the Unruh Act*

"The general policy embodied in [Civil Code] section 51 can be traced to the early common law doctrine that required a few, particularly vital, public enterprises—such as privately owned toll bridges, ferryboats, and inns—to serve all members of the public without arbitrary discrimination. (See generally, Tobriner & Grodin, *The Individual and the Public Service Enterprise in the New Industrial State* (1967) 55 Cal.L.Rev. 1247, 1250 [(Tobriner & Grodin)].) After the United States Supreme Court, in the *Civil*

---

[2] Given the issues before us, we need not discuss the specific factual and procedural background of this case. Suffice it to say petitioner, who suffers from autism, has alleged, among other things, that he has been the victim of disability discrimination at the hands of school personnel.

3

*Rights Cases* (1883) 109 U.S. 3 . . . , invalidated the first federal public accommodation statute, California joined a number of other states in enacting its own initial public accommodation statute, the statutory predecessor of the current version of [Civil Code] section 51. (Stats. 1897, ch. 108, § 2, p. 137.)" (*Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 607–608 (*Warfield*).)

Given the issues before us, it bears making more than passing reference to the *Civil Rights Cases.* These cases arose under a federal statute that prohibited private citizens from discriminating on the basis of race in operating or providing " 'accommodations, advantages, facilities, and privileges of inns, public conveyances on land or water, theatres, and other places of public amusement.' " (*Civil Rights Cases, supra,* 109 U.S. at p. 9.) Any person violating this prohibition was subject to a civil penalty enforceable in a legal action by the aggrieved person and to criminal prosecution. (*Ibid.*) The United States Supreme Court invalidated the statute.

The court first concluded the statute could not be sustained under the Fourteenth Amendment because the statutory prohibition was divorced from state action and was directed at conduct by private persons. (*Civil Rights Cases, supra,* 109 U.S. at pp. 10–20.) "It is State action of a particular character that is prohibited. Individual invasion of individual rights is not the subject matter of the amendment." (*Id.* at p. 11.) The court next considered whether the statute could be sustained under the Thirteenth Amendment as "necessary and proper" to enforce the constitutional prohibition of slavery. (*Id.* at pp. 20–24.) The court concluded "the act of a mere individual, the owner of the inn, the public conveyance or place of amusement, refusing the accommodation" could not "be justly regarded as

4

imposing any badge of slavery or servitude upon the applicant." Rather, said the court, it was an act "inflicting an ordinary civil injury, properly cognizable by the laws of the State, and presumably subject to redress by those laws." (*Id.* at p. 24.)

As our Supreme Court has since observed, many states, including California, enacted the state laws necessary to replace the invalidated federal statute that had endeavored to prohibit discriminatory conduct by private persons in the operation and provision of public accommodations, conveyances and places of amusement. (E.g., *Curran v. Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670, 686 (*Curran*); *Warfield, supra,* 10 Cal.4th at p. 607.) Thus, the nomenclature "public accommodation" statutes. (See *Curran,* at pp. 686–687; *Warfield,* at pp. 607–608; see generally Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application* (1960) 33 So.Cal.L.Rev. 260, 263 (Horowitz)[3].)

" 'Expanding upon the limited category of "public service enterprises" to which the early common law doctrine applied,' "[4] California's " '1897 statute,

---

[3] Our Supreme Court has cited to this scholarly article in each of its principle decisions addressing whether the defendant was a business establishment under the Act. (E.g., *Curran, supra,* 17 Cal.4th at p. 687, fn. 13; *Warfield, supra,* 10 Cal.4th at p. 608, fn. 8; *Isbister v. Boys' Club of Santa Cruz* (1985) 40 Cal.3d 72, 81 (*Isbister*) [describing Horowitz as "the principal commentator on the Unruh Act"]; *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 796 (*O'Connor*); *Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 469 (*Burks*).)

[4] The "public service doctrine" imposed on occupations and enterprises "providing a particular product or service to the community . . . attached to them certain obligations," including "the duty to serve all customers on reasonable terms without discrimination." (Tobriner & Grodin, *supra,* 55 Cal.L.Rev. at p. 1250.) Such occupations and enterprises included that of "blacksmith, food seller, veterinarian, and tailor, as well as those of common

as amended in 1919 and 1923, provided that "[a]ll citizens within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of inns, restaurants, hotels, eating houses, places where ice cream or soft drinks of any kind are sold for consumption on the premises, barber shops, bath houses, theaters, skating rinks, public conveyances and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law, and applicable alike to all citizens." (Stats.1923, ch. 235, § 1, p. 485.)' "[5] (*Curran, supra,* 17 Cal.4th at pp. 686–687, quoting *Warfield, supra,* 10 Cal.4th at pp. 607–608; see generally Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 261 [prior to 1959, there were "a few areas in which California law prohibited racial discrimination by private persons: *e.g.,* the Legislature had, in 1893 and 1897, enacted what eventually became Civil Code Sections 51–54, prohibiting such discrimination by operators of places of 'public accommodation,' 'amusement,' and 'entertainment,' " fn. & italics omitted].)

Thus, nothing in the historical context from which the Unruh Act emerged suggests the state's earlier public accommodation statutes were enacted to reach "state action." And there is much authority to the

---

carrier and innkeeper." (*Ibid.,* fns. omitted; see *Warfield, supra,* 10 Cal.4th at p. 607; Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 280.)

[5] The original 1897 statute was uncodified (Stats. 1897, ch. 108, § 1, p. 137), but "was virtually identical" to section 51 as first enacted. (Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 263.) The uncodified statute provided in pertinent part: "[A]ll citizens within the jurisdiction of this State shall be entitled to the full and equal accommodations, advantages, facilities, and privileges of inns, restaurants, hotels, eating-houses, barber-shops, bath-houses, theaters, skating-rinks, and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law and applicable alike to all citizens." (Stats. 1897, ch. 108, § 1, p. 137; see *Curran, supra,* 17 Cal.4th at p. 704 (conc. opn. of Mosk, J.).)

6

contrary—that these statutes were enacted to secure within our state law the prohibition against discrimination by privately owned services and enterprises the United States Supreme Court referenced in the *Civil Rights Cases* and which the common law had already begun to recognize through the public service doctrine. (See *Curran, supra,* 17 Cal.4th at pp. 686–687; *Warfield, supra,* 10 Cal.4th at pp. 607–608; see also Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 281 ["[i]t was clear that in [former] [Civil Code] Sections 51 and 52 the Legislature enacted a principle creating a right not to be discriminated against on grounds of race in some, but not all, relationships between private persons"].)

***Enactment of the Unruh Act***

" 'In 1959, in apparent response to a number of appellate court decisions that had concluded that the then-existing public accommodation statute did not apply to the refusal of a private cemetery, a dentist's office, and a private school to make their facilities available to African–American patrons (see *Long v. Mountain View Cemetery Assn.* (1955) 130 Cal.App.2d 328. . . ; *Coleman v. Middlestaff* (1957) 147 Cal.App.2d Supp. 833 . . . ; *Reed v. Hollywood Professional School* (1959) 169 Cal.App.2d Supp. 887. . . [(*Reed)*]]), the Legislature undertook, through enactment of the Unruh Civil Rights Act, to revise and expand the scope of the then-existing version of [Civil Code] section 51.' " (*Curran, supra,* 17 Cal.4th at p. 687, quoting *Warfield, supra,* 10 Cal.4th at p. 608.)

Given the issues before us, we again pause briefly to more fully describe *Reed.* In that case, a private school refused to admit a five-year-old prospective student because of her race, and she sued for damages under the state's public accommodation law. After suffering a nonsuit, she appealed to the superior court appellate division. (*Reed, supra,* 169 Cal.App.2d Supp. at

p. 888.)  The court concluded, on comparing the enterprises enumerated in the statute, that the private school was "not a place of public accommodation or amusement" within the meaning of the statute.  (*Id.* at p. 890; *Id.* at p. 889 ["The settled rule of law is that the expression 'all other places' means all other places of a like nature to those enumerated."].)

The court also contrasted the private school with the state public school system, pointing out the latter secured the educational rights of all students, including the plaintiff (*Reed, supra,* 169 Cal.App.2d Supp at pp. 888–889) and that "racial discrimination in public education is unconstitutional."  (*Id.* at p. 890, citing *Brown v. Board of Education of Topeka* (1954) 347 U.S. 483 (*Brown*).)  The court additionally rejected the plaintiff's invitation to conclude, solely on the basis of "public policy," that the public accommodation statute applied "to a matter of private relationship such as that here before us, since the defendant school has no monopoly and since the Legislature has specifically declared the public policy of the state in regard to discrimination in particular locations and it is the office of the Legislature and not of this court to make any additional enumerations which may be desirable."[6]  (*Reed,* at pp. 891–892.)

---

[6] The court's reference to a "monopoly" referred to cases such *James v. Marinship Corp.* (1944) 25 Cal.2d 721, 724, 745, in which our high court upheld a preliminary injunction prohibiting a shipbuilder from discharging African American employees based on a closed shop agreement with a closed union that discriminated on the basis of race.  "Where a union has, as in this case, attained a monopoly of the supply of labor by means of closed shop agreements and other forms of collective labor action, such a union occupies a quasi public position similar to that of a public service business and it has certain corresponding obligations.  It may no longer claim the same freedom from legal restraint enjoyed by golf clubs or fraternal associations.  Its asserted right to choose its own members does not merely relate to social relations; it affects the fundamental right to work for a living."  (*Id.* at p. 731.)  "The discriminatory practices involved in this case are, moreover,

As initially introduced, the legislation " 'proposed to revise the first paragraph of [the then existing] [Civil Code] section 51 to provide: "All citizens within the jurisdiction of this State, no matter what their race, color, religion, ancestry, or national origin, are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, and privileges in, or accorded by, all public or private groups, organizations, associations, business establishments, schools, and public facilities; to purchase real property; and to obtain the services of any professional person, group or association.' [Citation.]  Thereafter, the bill underwent a series of amendments in both houses of the Legislature.' " (*Curran, supra,* 17 Cal.4th at p. 687, italics omitted, quoting *Warfield, supra,* 10 Cal.4th at p. 608.)

These amendments, chronicled by Professor Horowitz, are of significant interest, given the issues before us.  (See *Curran, supra,* 17 Cal.4th at p. 687, fn. 13, quoting *Warfield, supra,* 10 Cal.4th at p. 608, fn. 8 [" 'The complete

_____

contrary to the public policy of the United States and this state.  The United States Constitution has long prohibited governmental action discriminating against persons because of race or color. (5th, 14th, and 15th Amendments.)" (*James v. Marinship Corp.,* at p. 739.)  "Although the constitutional provisions have been said to apply to state action rather than to private action, they nevertheless evidence a definite national policy against discrimination because of race or color.  Defendants contend that 'individual invasion of individual rights' can be prohibited only by a statute of the state, and they point out that California statutes forbidding racial discrimination by private persons relate only to certain specifically enumerated businesses such as inns, restaurants, and the like, but not to labor unions.  (Civ. Code, §§ 51–52.)  It has been said, however, that such statutes, to the extent that they embrace public service businesses, are merely declaratory of the common law.  [Citations.]  . . . Where, as here, a labor union has attained a monopoly of the labor supply through closed shop agreements, such a union, like a public service business, may not unreasonably discriminate against Negro workers for the sole reason that they are colored persons." (*Id.* at p. 740; see Tobriner & Grodin, *supra,* 55 Cal.L.Rev. at pp. 1256–1258.)

9

progression of the bill through the Legislature is set forth in detail in Horowitz[, *supra,*] 33 So.Cal.L.Rev. [at pp.] 265–270.' "].)

Two months after it was introduced, the bill was amended on March 24, 1959, as follows (new language italicized and some also bolded for emphasis):

" 'All citizens within the jurisdiction of this State, no matter what their race, color, religion, ancestry, or national origin, are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, and privileges in, or accorded by, all public or private groups, organizations, associations, business establishments, **schools**, and public facilities, ***except those institutions organized primarily for the purpose of, and which practice, the furthering of a specific sectarian religious belief or a specific national culture, and which limit their membership or affiliations to only those persons with a corresponding religious belief or national derivation;*** to purchase real property; and to obtain the services of any professional person, group or association.' " (Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 266 & fn. 32.)

A week later, on March 30, the legislation was again amended to read (new language italicized and some also bolded for emphasis):

" '. . . *All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, privileges, services or benefits set out, but not limited, by this section:*
'*(a) To all business establishments of every kind whatsoever;*
'*(b)* ***To all schools of every kind whatsoever, except those schools organized for the purpose of, and which practice, the furthering of a specific sectarian religious belief;***
'*(c) To the benefits administered or offered by any organization or institution receiving any tax advantage or exemption, or receiving any form of assistance from the Federal Government, or the State of California, or any municipality or any political subdivision of either;*
'*(d) To membership in any and all business or professional organizations formed or maintained primarily for the protection or advancement of the business or professional interests of the members;*
'*(e) To obtain the services of any professional person, group or association licensed or certified by the State of California, any*

10

*municipality or political subdivision or agency of either.'*" (Horowitz, *supra,* 33 So.Cal.L.Rev. at pp. 266–267 & fn. 33.)

A month later, on April 24, the bill was further amended (new language italicized and some also bolded for emphasis):

"'. . . All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, privileges, services or benefits set out, but not limited, by this section:
'(a) To all business establishments of every kind whatsoever;
'(b) **To all schools of every kind whatsoever, except those schools organized for the purpose of, and which practice, the furthering of a specific sectarian religious belief,** *insofar as the facilities of any such school so organized and following such practice are made available primarily to persons who subscribe to such belief*[;]
'(c) To the *charitable* benefits administered or offered by any organization or institution receiving any tax advantage or exemption, or receiving any form of assistance from the Federal Government, or the State of California, or any municipality or any political subdivision of either;
'(d) To membership in any and all business or professional organizations formed or maintained primarily for the protection or advancement of the business or professional interests of the members;
'(e) To obtain the services of any professional person, group or association licensed or certified by the State of California, any municipality or political subdivision or agency of either.'" (Horowitz, *supra,* 33 So.Cal.L.Rev. at pp. 267–268 & fn. 34.)

Two weeks later, on May 12, the legislation was amended yet again (new language italicized and some bolded for emphasis):

"'. . . All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, privileges, services or benefits set out, . . . by this section:
'(a) To all business establishments of every kind whatsoever;

11

'*(b) **To all schools which primarily offer business or vocational training . . . ;***
'(c) To the charitable benefits administered or offered by any organization or institution receiving any *direct subvention . . .* from the Federal Government, or the State of California, or any municipality or any political subdivision of either;
'(d) . . . *In* any and all business or professional organizations formed or maintained *by licensees of the State of California* primarily for the protection or advancement of the business or professional interests of the members;
'(e) . . . *From* any professional person, group or association licensed or certified by the State of California, any municipality or political subdivision or agency of either.' " (Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 268 & fn. 35.)

A month later, on June 11, the legislation was amended by way of significant deletions (bold added for emphasis):

" '. . . All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, privileges, services or benefits set out by this section:
'(a) To all business establishments of every kind whatsoever;
'(b) **To all schools which primarily offer business or vocational training**[.]' " (Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 269 & fn. 36.)

Four days later, on June 15, the bill was amended one last time to read as enacted (new language italicized):

" '. . . *This section shall be known, and may be cited, as the Unruh Civil Rights Act.*
'. . . *All* citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal . . . *accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.*'" (Horowitz, *supra,* 33 So.Cal.L.Rev. at pp. 269–270 & fn. 37.)

Petitioner urges us to conclude that a public school district is a business establishment under the Unruh Act because prior versions of the legislation referred to "schools." However, in *Warfield,* our Supreme Court expressly rejected such a construction of the Act, as we discuss in more detail *infra.* (*Warfield, supra,* 10 Cal.4th at pp. 614–615.)

Moreover, the prior versions of the bill reflect a progressive narrowing of the legislation's applicability to "schools." Although the legislation as introduced referred to " 'schools,' " the first round of amendments excepted schools " 'organized primarily for the purpose of, and which practice, the furthering of a specific sectarian religious belief or a specific national culture, and which limit[ed] their membership or affiliations to only those persons with a corresponding religious belief or national derivation.' " (Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 266 & fn. 32.) In the next round of amendments, the exception for schools furthering a national culture was eliminated. (*Id.* at pp. 266–267 & fn. 33.) And in subsequent amendments, the exception for religious schools was eliminated and only schools that " 'primarily offer[ed] business or vocational training' " were included. (*Id.* at p. 268 & fn. 35, italics omitted.) Thus, the category of schools to which the penultimate version of the legislation applied would not have included any public grammar schools or even public secondary schools. While the latter may offer some business or vocational training, the primary responsibility of both primary and secondary public schools is basic educational instruction. (See Ed. Code, §§ 51210, subd. (a) [enumerating required course of study for grades 1 through 6], 51220 [enumerating areas of study for grades 7 through 12]; see also 56 Cal.Jur.3d Schools §§ 237 [overview of required courses of study for grades 1 through 6], 238 [overview of required courses of study for grades 7 through 12].)

13

Nor can we overlook that the state's public accommodation laws, the immediate predecessors of the Unruh Act, were enacted in response to the *Civil Rights Cases*—that is, they were enacted to prohibit discriminatory conduct by individual proprietors and private entities offering goods and services to the general public. Federal anti-discrimination legislation could reach state action, but it could not, according to the United States Supreme Court, reach discriminatory conduct by private persons or entities. (See Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 260 ["Broadly speaking, the delineation of governmental policy with respect to racial discrimination by a private person (as distinguished from discrimination by a governmental entity, such as a state) in his relationships with other private persons is left, in the federal system, to the states."].)

Indeed, by the time the Unruh Act was enacted, the United States Supreme Court had already held racial discrimination in the public schools unconstitutional and repudiated the pernicious notion that segregated schools provided a separate but equal education. (*Brown, supra,* 347 U.S. at p. 495.) Thus, while there was a pressing need for state legislation to prohibit discrimination by private schools, and particularly vocational and technical schools that offered a path to employment, charged tuition, and offered their services to the general public, there was not a correlative need with respect to state public school systems.[7]

We also observe that the only specific references to government entities in any version of the legislation served to describe *other* enumerated private

---

[7] We fully appreciate that many states ignored *Brown* and it has taken decades and tireless effort to enforce its mandate. This has not been due to any lack of clarity as to the applicability of federal law to state public school districts, however, but rather to the sheer recalcitrance of states to comply with this law.

entities and organizations that would be required by the law to provide " 'full and equal admittance, accommodations, advantages, facilities, membership, privileges, services or benefits' " to the state's citizens. (Horowitz, *supra,* 33 So.Cal.L.Rev. at pp. 266–267, fn. 33, italics omitted.) The first such reference was in connection with " 'the benefits administered or offered by any organization or institution' " that claimed any tax advantage or received any form of assistance provided by " 'the Federal Government, or the State of California, or any municipality or any political subdivision of either.' " (*Id.* at p. 267 & fn. 33, italics omitted.) The second was to " 'the services of any professional person, group or association licensed or certified by the State of California, any municipality or political subdivision or agency of either.' " (*Ibid.*, italics omitted.) In short, the pending legislation, at certain points, described individuals and nongovernment entities availing themselves of federal or state tax advantages or economic assistance, or the benefits conferred by state or local licensing laws.

Thus, there is nothing in the legislative history of the Unruh Act, itself, that suggests the Act was intended to reach discriminatory conduct by state agents, such as public school districts, and, again, there is much to indicate otherwise. (See Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 262 [enactment of the new "[Civil Code] [s]ections 51 and 52, referring to 'business establishments,' result[ed] in California now expressing its policy against racial and other discrimination in this general area of relationships between private persons in a way which is unique among the states—*i.e.,* without the use of the word 'public,' and with the use of the words 'business' and 'establishments' "].)

### Supreme Court Precedent

Our Supreme Court has grappled with the meaning of the term "business establishment" as used in the Unruh Act in a number of cases.

One of the earliest was *Burks, supra,* 57 Cal.2d 463. "In *Burks*, the plaintiffs claimed that the defendants, a company and one of its employees who were engaged in developing, building, and selling a tract of houses, were violating the Unruh Civil Rights Act by allegedly refusing to sell homes in the tract to African–American customers on the same conditions offered to other customers. In discussing the scope of the statute, the court stated: 'The Legislature used the words "all" and "of every kind whatsoever" in referring to business establishments covered by the Unruh Act . . . , and the inclusion of these words, without any exception and without specification of particular kind of enterprises, leaves no doubt that the term "business establishments" was used in the broadest sense reasonably possible. The word "business" embraces everything about which one can be employed, and it is often synonymous with "calling, occupations, or trade, engaged in for the purpose of making a livelihood or gain." [Citations.] The word "establishment," as broadly defined, includes not only a fixed location, such as the "place where one is permanently fixed for residence or business," but also a permanent "commercial force or organization" or "a permanent settled position (as in life or business)." [Citations.] [Thus, it was] clear that defendants operated "business establishments" within the meaning of the term as used in the Unruh Act.' " (*Warfield, supra,* 10 Cal.4th at pp. 609–610, quoting *Burks, supra,* 57 Cal.2d at pp. 468–469, italics omitted.)

In addition to concluding the construction company was a business establishment under the Unruh Act, the court in *Burks* also rejected the company's due process challenge to the statute, stating: "Discrimination on the basis of race or color is contrary to the public policy of the United States and of this state. Although the antidiscrimination provisions of the federal Constitution relate to state rather than private action, they nevertheless

16

evidence a definite national policy against discrimination. [Citation.] The Legislature in the exercise of the police power may in appropriate circumstances prohibit private persons or organizations from violating this policy. . . . [¶] For more than 50 years prior to the enactment of the Unruh Act, sections 51 and 52 of the Civil Code contained provisions prohibiting discrimination in places of 'public accommodation and amusement.' The constitutionality of this legislation was upheld in *Piluso v. Spencer* (1918), 36 Cal.App. 416, 419 . . . , and there is no valid reason why the extension of the prohibition against discrimination to 'all business establishments,' including those dealing with housing, would be violative of due process. Discrimination in housing leads to lack of adequate housing for minority groups [citation], and inadequate housing conditions contribute to disease, crime, and immorality. Under the police power reasonable restrictions may be placed upon the conduct of any business and the use of any property [citations], and the restriction here imposed in furtherance of the policy against discrimination is reasonable." (*Burks, supra,* 57 Cal.2d at p. 471.)

In *O'Connor,* the court considered whether a nonprofit condominium association that adopted age-restrictive covenants was a business establishment under the Unruh Act. (*O'Connor, supra,* 33 Cal.3d at pp. 792, 796.) The court concluded it was, explaining: "Although our cases so far have all dealt with profit-making entities, we see no reason to insist that profit-seeking be the *sine qua non* for coverage under the act. Nothing in the language or history of [the Act] calls for excluding an organization from its scope simply because it is nonprofit. [Citation.] Indeed, hospitals are often nonprofit organizations, and they are clearly business establishments to the extent that they employ a vast array of persons, care for an extensive physical plant and charge substantial fees to those who use the facilities.

17

The Village Green Owners Association has sufficient businesslike attributes to fall within the scope of the act's reference to 'business establishments of every kind whatsoever.' Contrary to the association's attempt to characterize itself as but an organization that 'mows lawns' for owners, the association in reality has a far broader and more businesslike purpose. The association, through a board of directors, is charged with employing a professional property management firm, with obtaining insurance for the benefit of all owners and with maintaining and repairing all common areas and facilities of the 629–unit project. It is also charged with establishing and collecting assessments from all owners to pay for its undertakings and with adopting and enforcing rules and regulations for the common good. In brief, the association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders. A theme running throughout the description of the association's powers and duties is that its overall function is to protect and enhance the project's economic value. Consistent with the Legislature's intent to use the term 'business establishments' in the broadest sense reasonably possible [citation], we conclude that the Village Green Owners Association is a business establishment within the meaning of the act." (*Id*. at p. 796.)

In *Isbister,* the court considered whether a local Boys' Club, a private charitable organization, was, in operating a "community recreational facility," a business establishment under the Unruh Act. (*Isbister, supra*, 40 Cal.3d at p. 76.) The court concluded it was. (*Ibid*.)

The court commenced its opinion by stating: "The Act is this state's bulwark against arbitrary discrimination in places of public accommodation. Absent the principle it codifies, thousands of facilities in private ownership, but otherwise open to the public, would be free under state law to exclude

18

people for invidious reasons like sex, religion, age, and even race. The Legislature's desire to banish such practices from California's community life has led this court to interpret the Act's coverage 'in the broadest sense reasonably possible.'" (*Isbister, supra,* 40 Cal.3d at pp. 75–76, quoting *Burks, supra,* 57 Cal.2d at p. 468.)

The court went on to explain why the Boys' Club came within the bounds of the Unruh Act. The court first summarized the historical derivation of the Act, concluding that given "the Act's ancestry, its phrase 'business establishments,' clearly includes at least those facilities subject to the predecessor statute—i.e., 'places of public accommodation or amusement.'" (*Isbister, supra,* 40 Cal.3d at p. 79.) The court then pointed out "[c]ourts in other jurisdictions ha[d] consistently held that broad-based nonprofit community service organizations like the Boys' Club are 'public accommodations' covered by statutes analogous to California's pre-1959 civil rights law. For example, in language similar to our prior law, title II of the federal Civil Rights Act of 1964 (42 U.S.C.A. § 2000a et seq.) grants 'all persons' the right to 'full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.' A 'place of public accommodation' includes, among other specified facilities, 'any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment.' (*Id.,* § 2000a(b)(3). . . .) Title II has been applied to private, nonprofit recreational organizations which offer memberships to the public at large and exclude only a particular class of

19

persons protected by the statute."[8] (*Isbister,* at pp. 79–80, italics & fn. omitted.)

The court thus concluded "[t]he club certainly qualifies as a 'place of amusement.' Indeed, its primary function is to operate a permanent physical plant offering established recreational facilities which patrons may use at their convenience during the hours the Club is open." (*Isbister, supra,* 40 Cal.3d at p. 81.) Moreover, "the emphasis is on drop-in use of the Club's facilities, thus minimizing any sense of social cohesiveness, shared identity, or continuity. Boys who join the Club have no power in its affairs and no control over who else may be members. A fee, though not a large one, is charged for the annually renewable membership. Thus, the Club provides an atmosphere deemed characteristic of a 'public accommodation' by the principal commentator on the Unruh Act; relations with and among its members are of a kind which take place more or less in 'public view,' and are of a 'relatively nongratuitous, noncontinuous, nonpersonal, and nonsocial sort.'" (*Ibid.,* quoting Horowitz, *supra,* 33 So.Cal.L.Rev. at pp. 260, 287, 288.)

---

[8] The definitional provisions of Title II describe every conceivable kind of "public accommodation," that is, every kind of privately owned enterprise that offers goods and services to the general public. (*Id.,* § 2000, subds. (b) & (c).) However, "a private club or other establishment not in fact open to the public" is expressly excluded. (*Id.,* subd. (e).) We also note the federal courts have held public schools, in performing educational functions, are not places of public accommodation under Title II. (E.g., *Carroll v. Millersville University of PA* (E.D. Pa., June 6, 2019, No. 16-1406) 2019 WL 2423268, *5–7; *Alja-lz v. Ramsey* (W.D. Ky., Sept. 12, 2017, No. 3:14-CV-618-DJH) 2017 WL 6485803, *12; *Gilmore v. Amityville Union Free School Dist.* (E.D.N.Y. 2004) 305 F.Supp.2d 271, 279; see *Gallegos Adams County School District* (D. Colo. 2017) 2017 WL 4236320, fn. 4 [while not deciding issue given rulings on other issues, court nevertheless observes "courts in other jurisdictions find unequivocally that public schools are not places of public accommodation under Title II"].)

The court rejected the club's claim that because it collected only a small annual membership fee from patrons and had "no economic function," it was too "removed from the commercial world" to be subject to the Act. (*Isbister, supra*, 40 Cal.3d at p. 82.) The court pointed out the club had, "[o]f course," some " 'businesslike attributes,' " as it employed "a substantial paid staff" and owned and operated " 'an extensive physical plant.' " (*Id.* at p. 82.) But, said the court, it "need not rely exclusively on the Club's functional similarity to a commercial business. As we have seen, the Unruh Act replaced a statute governing all 'places of public accommodation or amusement' and was intended at a minimum to continue the coverage of 'public accommodations.' The Santa Cruz Boys' Club, as a public recreational facility, fits within that category. In these circumstances, the fact that its purposes and operations are not strictly commercial does not bar a conclusion that it is a 'business establishment' to which the Act applies." (*Id.* at p. 83, fn. omitted.)

In *Warfield,* the court considered whether a members-only golf and country club was a business establishment under the Unruh Act, and concluded it was. (*Warfield, supra,* 10 Cal.4th at pp. 598–599.)

The court first rejected, however, the plaintiff's assertion the court's earlier cases had "establish[ed] that the Legislature's adoption of the phrase 'all business establishments of every kind whatsoever' in the final, enacted version of the Unruh Civil Rights Act was intended to incorporate all entities and activities that had been included in the initial draft of the bill introduced in 1959," which had "referred specifically to 'membership . . . in . . . all public or private groups, organizations [and] associations.' " (*Warfield, supra*, 10 Cal.4th at p. 614.) "[T]he cited cases" said the court, did "not support plaintiff's reading." (*Ibid.*) "Nothing in the [*Burks*] opinion . . . suggest[ed] that the term 'all business establishments of every kind whatsoever' was

21

intended to encompass *all* of the entities or activities listed in the initial bill, without regard to whether such activities reasonably could be found to constitute a business establishment. Indeed, the court in *Burks,* in a subsequent passage *distinguishing* the scope of the Unruh Civil Rights Act from that of other legislation enacted the same year, [had] specifically stated: 'The Unruh Act relates only to discriminatory practices in "business establishments." ' " (*Warfield,* at pp. 614–615, quoting *Burks, supra,* 57 Cal.2d at p. 469, second italics added.) And "in *O'Connor* the court [had] stated in this regard: 'The broadened scope of business establishments in the final version of the bill, in our view, is indicative of an intent by the Legislature to include therein all formerly specified private and public groups or organizations that may reasonably be found to constitute "business establishments of every type whatsoever." ' [Citation.] As in *Burks*, nothing in *O'Connor* suggest[ed] that all private groups, organizations, or associations listed in the initial version of the bill invariably constitute 'business establishments' under [Civil Code] section 51; rather, *O'Connor* explain[ed] that such private groups or organizations are covered by [Civil Code] section 51 if they 'may reasonably be found to constitute "business establishments of every type whatsoever." ' " (*Warfield,* at p. 615, quoting *O'Connor, supra,* 33 Cal.3d at pp. 795–796, italics omitted.)

The court next addressed whether "private social clubs, *as a general matter*, constitute 'business establishments' within the meaning of [Civil Code] section 51." (*Warfield, supra,* 10 Cal.4th at p. 614.) After acknowledging that its decisions in *O'Connor* and *Isbister* demonstrate "the reach of [Civil Code] section 51 cannot be determined invariably by reference to the apparent 'plain meaning' of the term 'business establishment,' " the court—viewing the matter from a historical perspective—observed that

22

"[t]raditionally, statutes prohibiting discrimination in places of public accommodation have not been applied to the membership policies of private social clubs." (*Id.* at pp. 616–617, italics omitted.) It also found nothing in the language or the legislative history of either California's initial public accommodation statutes or the Unruh Act suggesting the Legislature intended to depart from that view. (*Id.* at pp. 617–618.) "Although the 1959 enactment of the current version of [Civil Code] section 51 clearly was intended to expand the reach of the 1897 statute, the Legislature's adoption of language making the statute applicable to 'all business establishments of every kind whatsoever' does not indicate that the contemplated expansion was intended, as a general matter, to encompass private social clubs." (*Id.* at p. 617.)

But this did not mean, the court went on to explain, that an entity or organization is exempt from the Unruh Act "simply because it characterizes itself as a 'private social club.'" (*Warfield*, *supra*, 10 Cal.4th at p. 619.) While the parties vigorously debated whether the golf and country club was truly a "private" club beyond the reach of the Act (each relying on out of state cases reaching varying results), the court concluded it did not need to reach the issue. Rather, it "conclude[d] that *the business transactions that [were] conducted regularly on the club's premises with persons who are not members of the club* [were] sufficient in themselves to bring the club within the reach of [Civil Code] section 51's broad reference to 'all business establishments of every kind whatsoever.'" (*Id.* at p. 621.)

To begin with, "the club regularly (on the average of once a week) permit[ed] nonmembers to use its facilities, for a fee, in connection with 'sponsored events.' In conducting such events, the club receive[d] funds from nonmembers for the use of the club's golf course, tennis courts, and dining

23

and bar facilities, and also obtain[ed] revenue from the sale (at a markup) of food and beverages to nonmembers at the club's snack bar and other dining facilities on the club's premises." (*Warfield*, *supra*, 10 Cal.4th at p. 621.) "In carrying on such activities for a fee, the club operate[d] as the functional equivalent of a commercial caterer or a commercial recreational resort— classic forms of 'business establishments'—and, indeed, presumably compete[d] with business entities that offer comparable services and that clearly are subject to the strictures of [Civil Code] section 51." (*Ibid.*) Additionally, the club "obtain[ed] income, on a regular basis, from fees charged for the use of its facilities, and the purchase of food and beverages on its premises, by nonmember 'invited guests.' " (*Ibid.*) "To the extent the club obtain[ed] payment from nonmembers for meals served to guests in the club's dining room, for drinks obtained by guests from the club's bar, and for the guests' use of the club's golf course or other facilities, the club, once again, appear[ed] to have been operating in a capacity that is the functional equivalent of a commercial enterprise.' " (*Id.* at pp. 621–622.) The club also "obtain[ed] a significant, albeit indirect, financial benefit from the regular business transactions with nonmembers conducted at the golf and tennis pro shops located on its premises," shops that "realistically must be viewed as an integral part of the club's overall operations." (*Id.* at p. 622.)

The court concluded that "because of the involvement of defendant's operations in the variety of regular business transactions with nonmembers discussed above, the club must properly be considered a business establishment within the meaning of Civil Code section 51. Although the club is a nonprofit organization, and there is no suggestion that the activities in question were intended to generate a profit that might be distributed to members, the direct and indirect financial benefits that the club derived from

24

its business transactions with nonmembers nonetheless inured to the financial benefit of the club members, because the revenue from such transactions permitted the members to maintain the club's facilities and services—which were reserved primarily for the benefit of the members— through the payment of dues and fees lower than would have been required in the absence of the income obtained from nonmembers." (*Warfield, supra,* 10 Cal.4th at pp. 622–623.) The "club's regular business transactions with nonmembers," thus, "render[ed] it a 'business establishment' for purposes of [Civil Code] section 51." (*Id.* at p. 623.)

This brings us to *Curran* and its companion case *Randall,* which considered whether the Boy Scouts organization, in making membership decisions, is a business establishment under the Unruh Act. (*Curran, supra,* 17 Cal.4th 670.) The court concluded it is not. (*Id.* at p. 673.)

As it had in *Warfield,* the court commenced with a discussion of the historical origin of the state's public accommodation statutes, the legislative history of the Unruh Act, and its prior opinions. (*Curran, supra,* 17 Cal.4th at pp. 686–696.) The court also reiterated that precedent established the term business establishment must be "interpreted 'in the broadest sense reasonably possible.'" (*Curran, supra,* 17 Cal.4th at p. 696, quoting *Burks, supra,* 57 Cal.2d at p. 468.)

"Nonetheless," said the court, "although past California decisions demonstrate that the Act clearly applies to any type of for-profit commercial enterprise, and to nonprofit entities—like the condominium association in *O'Connor*—whose purpose is to serve the business or economic interests of its owners or members, no prior decision ha[d] interpreted the 'business establishments' language of the Act so expansively as to include the membership decisions of a charitable, expressive, and social organization,

25

like the Boy Scouts, whose formation and activities are unrelated to the promotion or advancement of the economic or business interests of its members." (*Curran, supra,* 17 Cal.4th at p. 697, fn. omitted.)

The court also recognized that in *Isbister,* it "concluded that in light of the legislative history demonstrating that the Unruh Civil Rights Act was intended to extend the reach of California's prior public accommodation statute, the very broad 'business establishments' language of the Act reasonably must be interpreted to apply to the membership policies of an entity—even a charitable organization that lacks a significant business-related purpose—if the entity's attributes and activities demonstrate that it is the functional equivalent of a classic 'place of public accommodation or amusement.' " (*Curran, supra,* 17 Cal.4th at p. 697, quoting *Isbister, supra,* 40 Cal.3d at p. 83, italics omitted.)

The court disagreed, however, "that the circumstance that the Boy Scouts is generally nonselective in its admission policies, and affords membership to a large segment of the public, is itself sufficient to demonstrate that the organization reasonably can be characterized as the functional equivalent of a traditional place of public accommodation or amusement." (*Curran, supra,* 17 Cal.4th at p. 697.)  Rather, the "record establishe[d] that the Boy Scouts is an organization whose primary function is the inculcation of a specific set of values in its youth members, and whose recreational facilities and activities are complementary to the organization's primary purpose.  Unlike membership in the Boys' Club of Santa Cruz, Inc., membership in the Boy Scouts is not simply a ticket of admission to a recreational facility that is open to a large segment of the public and has all the attributes of a place of public amusement." (*Id.* at pp. 697–698.)

26

The court also distinguished *Warfield.* (*Curran, supra,* 17 Cal.4th at p. 699.) "[T]he business transactions with nonmembers at issue in *Warfield* involved the country club's practice of permitting, on a regular basis, nonmembers to use the various recreational and dining facilities of the club for a fee, a practice that generated a substantial amount of revenue for the club and provided a financial benefit to club members by permitting them to enjoy their preferred access to the club's facilities through the payment of lower dues and fees. As . . . we explained in *Warfield* . . . '[i]n carrying on such activities for a fee, the club operates as the functional equivalent of a commercial caterer or a commercial recreational resort—classic forms of "business establishments"—and, indeed, presumably competes with business entities that offer comparable services and that clearly are subject to the strictures of [Civil Code] section 51.' " (*Curran,* at p. 699.)

While the "Boy Scouts, like the country club in *Warfield,* engages in business transactions with nonmembers on a regular basis (through the operation of retail shops and the licensing of the use of its insignia), the Boy Scouts' business activities differ from those of the defendant in *Warfield* in a very significant respect. . . . [T]he Boy Scouts is an expressive social organization whose primary function is the inculcation of values in its youth members, and whose small social group structure and activities are not comparable to those of a traditional place of public accommodation or amusement. Unlike those involved in *Warfield,* the business transactions with nonmembers engaged in by the Boy Scouts do *not* involve the sale of access to the basic activities or services offered by the organization." (*Curran, supra,* 17 Cal.4th at pp. 699–700.) The Boy Scout's "business transactions are distinct from" its "core functions and do not demonstrate

27

that the organization has become a commercial purveyor of the primary incidents and benefits of membership in the organization." (*Id.* at p. 700.)

In *Randall*, the court reached the same conclusion it had in *Curran,* stating: "[W] e conclude that defendant's attributes and activities render the Unruh Civil Rights Act inapplicable to its membership decisions. Defendant not only is a charitable organization with a predominantly expressive social purpose unrelated to the promotion of the economic interests of its members, but offers to its members a program that is not the equivalent of a traditional place of public accommodation or amusement. Despite the organization's limited business transactions with the public, defendant does not sell the right to participate in the activities it offers to its members. For these reasons, with regard to its membership decisions, defendant is not operating as a business establishment within the purview of California's public accommodation statute." (*Randall, supra,* 17 Cal.4th at p. 744.)

What do we discern from these cases that is of particular significance to the issues before us?

First, while our high court has never considered whether a state entity fulfilling a state constitutional mandate is a business establishment for purposes of the Unruh Act, the court has, in deciding whether private entities are such, considered both the historical genesis of our public accommodation laws and the legislative history of the Act. As we have discussed, these areas of inquiry indicate our public accommodation laws, including in its most recent form, have been, and remain, directed at private, rather than state, conduct.

Nothing in the high court's decisions suggests otherwise, and, in fact, the court's commentary about the Unruh Act echoes what seems apparent from its history. In *Burks,* after concluding the private construction company

28

was a business establishment, the court went on to uphold the Act against a due process challenge on the ground the state could, through its police powers, prohibit "*private* persons or organizations" from discriminating on the basis of race. (*Burks, supra,* 57 Cal.2d at p. 471, italics added.) In *Isbister,* the court began its opinion by emphasizing what the consequence would be if it concluded the Boys' Club was not a business establishment within the meaning of the Act: "Absent the principle it codifies, thousands of facilities *in private ownership*, but otherwise open to the public, would be free under state law to exclude people for invidious reasons like sex, religion, age, and even race. The Legislature's desire to banish *such practices* from California's community life has led this court to interpret the Act's coverage 'in the broadest sense reasonably possible.' " (*Isbister, supra,* 40 Cal.3d at pp. 75–76, quoting *Burks,* at p. 468, italics added.) In like vein, the court closed its opinion with the comment that its decision did not "foreclose the Legislature from a more precise formulation of the situations in which *private* discrimination is forbidden." (*Isbister,* at p. 91, italics added.) In *Warfield*, the court explained that the Act can be "traced to the early common law doctrine that required a few, particularly vital, public enterprises—such as *privately-owned* toll bridges, ferryboats, and inns—to serve all members of the public without arbitrary discrimination." (*Warfield, supra,* 10 Cal.4th at p. 607, italics added.)

The scholarly works to which the court has repeatedly cited, express this same understanding—that the progenitor common law public interest doctrine and our post-*Civil Rights Cases* public accommodation statutes, including the Unruh Act, are the means by which the courts and the state, respectively, have sought to reach and prohibit discriminatory conduct by private persons and entities that offer goods and services to the general

29

public. (E.g., Tobriner & Grodin, *supra*, 55 Cal.L.Rev. at pp. 1249–1250, 1253, 1263; Horowitz, *supra,* 33 So.Cal.L.Rev. at pp. 260–263, 280.) Indeed, Horowitz stated categorically that the Unruh Act "result[ed] in California now expressing its policy against racial and other discrimination in this general area of relationships between *private* persons in a way which is unique among the states—*i.e.,* without the use of the word 'public,' and with the use of the words 'business' and 'establishments.' " (Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 262, first italics added.)

Secondly, many of the high court's reasons for why it determined private entities were business establishments under the Unruh Act do not pertain to our public school districts. The "overall function" of a public school district is not to "enhance" its "economic value." (*O'Connor, supra,* 33 Cal.3d at p. 796.) While a public school district may provide some athletic facilities for the physical education of its students, these facilities are not the district's "principal activity and reason for existence." (*Isbister, supra,* 40 Cal.3d at p. 76.) Nor do public school districts provide a "physical plant" for "patrons [to] use at their convenience" and for which they pay an annual membership fee. (*Id.* at p. 81.) "Commercial transactions" with the general public are not "an integral part of [a public school district's] overall operations." (*Warfield, supra,* 10 Cal.4th at p. 622.) The "attributes and activities" of a public school district are not "the functional equivalent of a classic 'place of public accommodation or amusement." (*Curran, supra,* 17 Cal.4th at p. 697.) And whatever commercial activities a public school district may engage in (such as allowing school clubs or booster organizations to sell goods to raise funds for extracurricular student activities, or allowing school athletic departments to charge a small admission fee for student athletic events), "do not involve the sale of access to the basic" education that public school districts are

30

charged by the state with delivering to every school-age child pursuant to state constitutional mandate.  (*Id.* at p. 700, italics omitted.)  Public school districts do not "sell the right to participate" in the basic educational programs and services they deliver.  (*Randall, supra,* 17 Cal.4th at p. 744.)

We thus conclude the decisions of our Supreme Court confirm what seems apparent from the historical origins of the Unruh Act, its legislative history and the scholarly commentary—that California's public school districts are not business establishments under the Act.

***Other Court Decisions Interpreting the Unruh Act***

Our conclusion is consistent with decisions by other Courts of Appeal that have considered whether a government entity was a business establishment under the Unruh Act and concluded they were not.  (*Harrison v. City of Rancho Mirage* (2015) 243 Cal.App.4th 162, 175 [city not a business establishment in amending municipal code to increase age of person "responsible" for short-term rental]; Q*ualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 764 [city "not functioning as a 'business establishment' " in enacting legislation regulating medical marijuana]; *Burnett v. San Francisco Police Department* (1995) 36 Cal.App.4th 1177, 1191–1192 [city ordinance restricting young adults from after-hours clubs not actionable under Unruh Act; nothing in Act "precludes *legislative bodies* from enacting ordinances that make age distinctions among adults"]; see *Carter v. City of Los Angeles* (2014) 224 Cal.App.4th 808, 825–826 (*Carter*) [although appellate court reversed approval of class action settlement, it agreed recovery of damages under Unruh Act was "unlikely," as a "public entity

providing sidewalks and curbs to its citizens does so as a public servant, not a commercial enterprise"].)

Although the analyses in these cases was more limited than ours here and generally focused on a government entity's legislative activity, the result they reached is the same—government entities were held not to be business establishments under the Unruh Act. Furthermore, public school districts can well be described, in acting as the state's agent in delivering constitutionally mandated, free primary and secondary education to the state's school age children, as a "public servant, not [as] a commercial enterprise."[9] (*Carter, supra,* 224 Cal.App.4th at p. 825.)

---

[9] In his briefing, petitioner did not cite any California case that specifically considered whether a government entity was a business establishment and reached a conclusion contrary to that reached in these cases. At oral argument, counsel referred to *Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744 (*Gatto*). In that case, the plaintiff sued both the county and the company operating the county's fair after he was refused admission because he was wearing a vest with Hells Angels insignia. (*Id.* at p. 749.) The appellate court reversed a judgment for the plaintiff to the extent it was based on the Unruh Act, on the ground he was not a member of any class protected by the Act. (*Id.* at pp. 765–769.) The court affirmed to the extent the judgment could be characterized as a state constitutional free speech claim. (*Id.* at pp. 769–777.) On the way to reaching these holdings, the court considered whether a one-year or three-year statute of limitations applies to an Unruh Act claim and concluded it depends on whether the cause of action at issue "evolved from the common law." If so, the one-year statute applies. (*Id.* at p. 759.) The court next considered whether the Government Claims Act applied to the plaintiff's purported Unruh Act claim and concluded it did so, thereby extending the limitations period applicable to the purported claim. (*Id.* at p. 765.) The county did not raise the issue of whether it, as well as the corporation operating the fair, was a business establishment under the Unruh Act. The sole comment the court made even tangentially in that regard was in response to the plaintiff's attempt to distinguish a case that had rejected a similar apparel/free speech discrimination claim against a private bar. The court stated in passing, "by its own terms, the equal access in accommodations provision of the Unruh

We must also comment on *Doe v. California Lutheran High School Assn.* (2009) 170 Cal.App.4th 828 (*California Lutheran*), in which the Court of Appeal concluded a private, religiously affiliated secondary school was not a business establishment under the Act. Contrasting *Warfield* and *Curran,* the court concluded the school shared many of the same attributes of the Boy Scouts, in that the student body was limited to those sharing the Lutheran faith and a significant aspect of the school's educational mission was furthering the religious tenants of the church. (*Id.* at pp. 838, 840–841.) The court concluded by emphasizing the narrow scope of its holding. (*Id.* at p. 841) Indeed, as we have observed, a secular private school, charging tuition and generally open to school-age children, is likely a business establishment for purposes of the Act. (See Horowitz, *supra*, 33 So.Cal.L.Rev. at pp. 285–286.)

Finally, we must comment on the federal court cases that have considered whether California public school districts are business

Civil Rights Act applies to 'all business establishments whatsoever,' " and thus the rejection of an apparel/free speech claim in the private bar case was as "applicable to a county fair as to a private drinking establishment." (*Id.* at pp. 765–769.) At best, this is an aside, and a case is "not authority, of course, for issues not raised and resolved." (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 943.) And as our lengthy discussion above reveals, there is *far* more to the analysis of whether an entity is a business establishment than the one-liner deployed in *Gatto.*

*Los Angeles County Metropolitan Transportation Authority v. Superior Court* (2004) 123 Cal.App.4th 261, 264, 267–276, not cited by petitioner but which we reviewed in doing our own research, likewise, is of no assistance to petitioner, as the transit authority raised only one issue in its original writ proceeding—whether the plaintiff, in connection with an Unruh Act claim, could seek statutory "penalties." The Authority did not raise, nor did the court address, whether it was a business establishment under the Act.

33

establishments under the Unruh Act.  In the wake of *Curran*, the federal courts have split on the question.

In *Zuccaro v. Martinez Unified School District* (N.D. Cal. Sept. 27, 2016, No. 16-cv-02709-EDL) 2016 WL 10807692 (*Zucarro*), the district court concluded, after a discussion of *Isbister* and *Curran*, as well as the California Court of Appeal decisions we have discussed, that "a public elementary school, particularly in its capacity of providing a free education to a special needs preschooler, is similarly acting as a public servant rather than a commercial enterprise and is therefore not subject to the Unruh Act."  (*Id.* at *9–13.)

*Zuccaro* acknowledged its conclusion was contrary to that of other district courts—a line of cases on which petitioner here relies.  *Zuccaro* pointed out these cases have all been predicated on *Isbister's* reminder that the Unruh Act applies to " 'all business establishments of every kind whatsoever' " and therefore must be interpreted in " 'the broadest sense reasonably possible' " (*Isbister, supra,* 40 Cal.3d at pp. 75–76), and its holding that a nonprofit entity can be a business establishment within the meaning of the Act.  (*Zucarro, supra,* 2016 WL 10807692 at *10–12.)  *Zuccaro* concluded these features of *Isbister,* in isolation, were not dispositive, given the analysis in *Curran.*  (*Id.* at *10–13; see *Anderson v. County of Siskiyou* (N.D. Cal. Sept. 10, 2010, No. C10-01428) 2010 WL 3619821 at *6 [county jail is not a business establishment]; *Taormina v. California Dept. of Corrections* (S.D. Cal. 1996) 946 F.Supp. 829, 834 [state prison is not a business establishment].)

We agree with *Zucarro's* assessment of the line of district court cases concluding a California public school district is a business establishment under the Unruh Act.  While focusing on certain aspects of *Isbister,* these

34

cases have largely ignored other aspects of our high court's decisions. None of these cases have engaged in any meaningful examination of the historical origins of the Unruh Act or its legislative history. Nor have any of these cases discussed the two scholarly articles, one co-authored by the justice who wrote the majority opinion in *Isbister,* our high court has repeatedly cited in analyzing whether an entity is a business establishment. Thus, these federal cases (presumably because they did not examine the historical background of the Act), were not attentive to our high court's opening and closing comments in *Isbister*—that without generous interpretation, "thousands of facilities *in private ownership*," would be free to engage in invidious discrimination, and its decision did not foreclose the legislature from enacting a more "precise formulation of the situations in which *private* discrimination is forbidden." (*Isbister, supra,* 40 Cal.3d at pp. 75, 91, italics added.)

In fact, many of these cases have simply cited to the first district court case to conclude a California public school district was a business establishment, *Sullivan v. Vallejo City Unified School Dist.* (E.D. Cal. 1990) 731 F.Supp. 947 (*Sullivan*). *Sullivan's* reasoning was as follows: "The California Supreme Court has taught that the 'Legislature's desire to banish [discrimination] from California's community life has led [that] court to interpret the Act's coverage "in the broadest sense reasonably possible." ' [Citations.] Under a parity of the reasoning adopted in *Isbister,* it appears relatively certain that it is 'reasonably possible' that 'business establishments' as used in the statute includes public schools." (*Id.* at p. 952.) The court then pointed to *Isbister's* comment that "[t]he broadened scope of business establishments in the final version of the bill, . . . is indicative of an intent by the Legislature to include therein *all private and public groups or organizations* [specified in the original bill] that may

35

reasonably be found to constitute 'business establishments of every type [sic] whatsoever.' " (*Ibid.*)  "In like fashion," said the district court, "since public schools were among those organizations listed in the original version of the Unruh Act, it must follow that for purposes of the Act they are business establishments as well." (*Id.* at p. 53.)  Thus, not only was *Sullivan's* analysis bereft of any depth, but, as we have discussed, in *Warfield,* our high court squarely rejected the latter prong of the district court's reasoning.

In *Whooley v. Tamalpais Union High School Dist.* (N.D. Cal. 2019) 399 F.Supp.3d 986 (*Whooley*), the district court nevertheless took issue with *Zuccarro* and endorsed *Sullivan's* approach.  The court first distinguished *Curran* and *California Lutheran.*  Unlike the Boy Scouts and the private, religious high school, said the district court, the high school district "is a public operation that provides educational services to the local community at no cost to the individuals its serves." (*Id.* at p. 998.)  The court next pronounced as inapposite the California appellate court cases concluding other government entities were not business establishments—none, said the district court, "dealt with public schools with their 'quintessential character of providing public accommodations and services to students.' " (*Ibid.*, citing *Yates v. East Side Union High School Dist.* (N.D.Cal. Feb. 20, 2019, No. 18-cv-02966-JD) 2019 WL 721313 at *2.)  In short, *Whooley* (as does *Yates*) suffers from the same analytical shortcomings as *Sullivan.*  As we have discussed at length, the historical genesis of the Unruh Act, its legislative history, scholarly commentary, and the decisions of our high court all demonstrate California's public school districts are *not* quintessential "public accommodations" within the meaning of our state's public accommodation law.

***Education Code Sections 200 et seq.***

Casting beyond the Unruh Act, petitioner maintains a 1998 amendment to Education Code section 201 demonstrates California public school districts are business establishments under the Act.  Petitioner reads far too much into this amendment to the Education Code.

Education Code section 201 is part of an extensive array of anti-discrimination statutes applicable to any educational institution, public or private, that receives any form of state funding.  (Ed. Code, § 210.3, ["For purposes of this chapter, 'educational institution' means a public or private preschool, elementary, or secondary school or institution; a public or private institution of vocational, professional, or postsecondary education. . ."], *id.*, § 220 [provisions prohibiting discrimination apply to any school "that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid"]; see generally *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 589–597, 603–608 (*Donovan*) [discussing features of this statutory scheme].)  Thus, these statutory provisions apply, as the Unruh Act likely does, to private schools that accept state funding, with the exception of religious schools.  (Ed. Code, § 221 [excepting religious schools]; *California Lutheran, supra,* 170 Cal.App.4th at p. 840.)  They do not apply to secular private schools that rely solely on other sources of funding, such as tuition and private donations—again, schools that are likely subject to the Unruh Act.

As originally enacted in 1982, Education Code sections 200 et seq. prohibited only sex discrimination.  (See generally, *Donovan, supra,* 167 Cal.App.4th at p. 603.)  Committee reports explained:  "This bill would consolidate a variety of state and federal laws prohibiting sex discrimination in public and private educational institutions receiving state funds and

declare a state policy of non-discrimination." (Sen. Com. on Education., Staff Analysis of Assem Bill No. 3133 (1981–1982 Reg. Sess.) as amended June 29, 1982, p. 1.) The Enrolled Bill Report similarly stated: "This bill's provisions establish no fundamentally new requirements or procedures regarding sex discrimination. Rather, the bill clarifies and makes specific various prohibitions of sex discrimination contained in existing State and Federal law." (Enrolled Bill Report, Assem. Bill No. 3133 (1981–1982 Reg. Sess.) as amended Aug. 9, 1982, p. 1.)

In 1998, these statutory provisions were amended and augmented to consolidate and standardize anti-discrimination provisions previously scattered throughout the Education Code and to clarify that these provisions are enforceable through a private right of action for any "civil law remed[y]," including damages and injunctive relief. (Ed. Code, § 262.3, subd. (b); see *Donovan, supra,* 167 Cal.App.4th at pp. 591–596.) These amendments also put in place a "cooling off" period prior to filing suit "to avoid 'throwing [public] schools into immediate litigation' [citation] and to give schools an opportunity to resolve informally as many cases as possible." (*Id.* at p. 607.)

As the Assembly Judiciary Committee explained, "This bill would consolidate and standardize the non-discrimination language in the Education Code into two chapters, one for K-12 and another chapter for higher education. It would also strengthen the gender equity provisions for K-12 systems, clarify a private right of action for discrimination claims arising under the Education Code, and expand the remedies available for discrimination in educational institutions to include monetary damages." (Assem. Com. on Judiciary, Assem. Bill No. 499 (1997–1998 Reg. Sess.) as amended Apr. 9, 1997, p. 1) The report also observed that the Department of Education had requested that instead of wholly eliminating the need to

38

exhaust administrative remedies, the bill instead include a reasonable period for administrative review, suggesting 60 days, and "the author [had] agreed to accept [the] amendment" to the bill. (*Id.* at p. 3.)

In one of the last, if not the last, round of amendments, language referencing the Unruh Act was added to Education Code section 201, subdivision (g), which had read as follows:

> "(g)  It is the intent of the Legislature that this chapter shall be interpreted as consistent with Section 11135 of the Government Code, Titles VI and IX of the federal Civil Rights Act, Section 504 of the federal Rehabilitation Act of 1973, the federal Americans with Disabilities Act, and the federal Equal Education Opportunities Act, except where this chapter may grant more protections or impose additional obligations, and that the remedies provided herein shall not be the exclusive remedies, but may be combined with remedies that may be provided by the above statutes." (Assem. Bill No. 499 (1997–1998 Reg. Sess.) as amended Jan. 27, 1998, p. 6.)

As amended the subdivision provided, as it does today:

> "(g) It is the intent of the Legislature that this chapter shall be interpreted as consistent with Article 9.5 (commencing with Section 11135) of Chapter 1 of Part 1 of Division 3 of Title 2 of the Government Code, Title VI of the federal Civil Rights Act of 1964 (42 U.S.C. Sec. 1981, et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. Sec. 1681, et seq.), Section 504 of the federal Rehabilitation Act of 1973 (29 U.S.C. Sec. 794(a)), the federal Individuals with Disabilities Education Act (20 U.S.C. Sec. 1400 et seq.), the federal Equal Educational Opportunities Act (20 U.S.C. Sec. 1701, et seq.), the Unruh Civil Rights Act (Secs. 51 to 53, incl., Civ. C.), and the Fair Employment and Housing Act (Pt. 2.8 (commencing with Sec. 12900), Div. 3, Gov. C.), except where this chapter may grant more protections or impose additional obligations, and that the remedies provided herein shall not be the exclusive remedies, but may be combined with remedies that may be provided by the above statutes." (Ed. Code, § 201, subd. (g).)

39

Committee reports and bill analyses continued to describe the legislation as before.  (E.g., Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading of Assem. Bill No. 499 (1997–1998 Reg. Sess.) as amended July 22, 1998, pp. 1-2; Conc. in Senate Amendments Assem. Bill No. 499 (1997–1998 Reg. Sess.) as amended July 22, 1998, p. 2.)

The author's transmittal letter asking for the Governor's signature, similarly, emphasized the following:  "[T]he bill consolidates and standardizes the non-discrimination language in the Education Code for easy reference and identification.  The scattered, inconsistent language in the Education Code makes it hard for even the most well intentioned educators to be sure they are always in compliance with the law." (Assembly member Sheila Kuehl, letter to then-Governor Pete Wilson, requesting his signature on Assem. Bill No. 499 (1997–1998 Reg. Sess.) Sept. 2, 1998, p. 1.)  *The bill does not redefine or expand existing non-discrimination statutes.*" (*Ibid.*)  And to "solve [the] problem" created by delays in reviewing administrative claims and statute of limitations, "without putting schools at risk of immediate litigation or preventing students from pursuing a timely remedy, AB 499 requires a cooling off period, where K-12 students are required to go through four and a half months of administrative grievance processes prior to the pursuit of civil remedies other than injunctive relief." (*Ibid.*)  Accordingly, "AB 499 would help to contain the costs of litigation, while enhancing equal opportunity for California's students." (*Ibid.*)

Accordingly, the 1998 amendments to Education Code sections 200 et seq. did not purport to say anything about the substantive reach of the Unruh Act.  And the amended language of Education Code section 201, subdivision (g), specifically, does not say public school districts are business establishments under the Unruh Act.  Rather, it states the *Education Code*

40

anti-discrimination statutes are to be applied "as consistent with" a number of anti-discrimination laws, including the Unruh Act, "except where" the Education Code anti-discrimination statutes "may grant more protections or impose additional obligations. . . ." (Ed. Code, § 201, subd. (g).) Moreover, the plain language of Education Code section 201, subdivision (g) recognizes that the listed statutes, including the Unruh Act, may be more limited in some respects than the Education Code anti-discrimination statutes.[10]

We also note the Education Code's extensive anti-discrimination statutory scheme prohibits the same kinds of discrimination as does the Unruh Act. In fact, the Education Code statutes are somewhat more generous than the Unruh Act in that they do not require a plaintiff to prove "intentional" discrimination, generally required under the Unruh Act (although not in cases of disability discrimination, as we discuss *infra*). (See *Donovan, supra,* 167 Cal.App.4th at pp. 603–608 [looking to Title IX (20 U.S.C. § 1682) as the model for the elements of a damages action under Education Code section 220 based on peer harassment, and concluding there

---

[10] We note the state Superintendent of Public Instruction has been for many years, and remains, charged with the responsibility "for providing leadership to local agencies to ensure" that the anti-discrimination provisions of not only "Education Code sections 200 through 253," but also "Government Code sections 11135 through 11139" and a litany of federal statutes, "are met in educational programs that receive or benefit from state or federal financial assistance and are under the jurisdiction of the State Board of Education." (Cal. Code Regs. tit. 5, § 4902, subd. (a)–(b); see *Hector F. v. El Centro Elementary School Dist.* (2014) 227 Cal.App.4th 331, 333 ["[T]he Legislature has imposed on public schools in California an affirmative duty to protect public school students from discrimination and harassment engendered by race, gender, sexual orientation or disability. (See Gov. Code § 11135; Ed. Code §§ 201, 220, 32261, 32280, 32281 & 32282.)"].) To this end, the state Department of Education has enacted and maintained its own administrative investigation and complaint procedures. (Cal. Code Regs. tit. 5, §§ 4601 et seq., 4962.)

was ample evidence school district had notice of, and was deliberately indifferent to, such harassment].)  They are less generous than the Unruh Act in that they do not provide for treble damages, statutory penalties, punitive damages, or statutory attorney fees.  (Compare Civ. Code, § 52, subd. (b) & Ed. Code, § 262.3, subd. (b).)  This difference is not quite as significant as might first appear, as Government Code section 818 bars punitive damages against "public entities," which include public school districts.  (Gov. Code, § 818; see *Visalia Unified School Dist. v. Superior Court* (2019) 43 Cal.App.5th 563, 570 (*Visalia Unified*) [" 'Requiring . . . public entit[ies] to pay punitive damages would punish the very group imposition of punitive damages was intended to benefit'—the taxpaying members of the general public.' "  Quoting *City of Sanger v. Superior Court* (1992) 8 Cal.App.4th 444, 450.].)

We further observe that in crafting the comprehensive anti-discrimination provisions set forth in Education Code sections 200 et seq., the Legislature considered and weighed policy considerations of particular importance to schools funded in whole or in part with tax dollars—namely, maximizing the use of these limited funds for educational purposes.  The required "cooling off" period, for example, not only allows schools to respond quickly to discriminatory conduct and thereby minimize harm to students from such conduct, but also enables schools to contain litigation costs by informally resolving as many complaints as possible.  (See *Donovan, supra,* 167 Cal.App.4th at pp. 607–608.)  Similarly, allowing for the recovery of all actual damages but not enhanced statutory damages, acknowledges that "in light of the stringent revenue, appropriations, and budget restraints under which all California governmental entities operate," exposing school districts to enhanced  statutory damages "would significantly impede their fiscal

42

ability to carry out their core public missions." (*Wells, supra,* 39 Cal.4th at p. 1193; *id.* at pp. 1191–1193 [holding school districts not an "association," "organization," or "business" under the state false claims act, which allows for double and treble statutory damages]). Indeed, "[i]n the particular case of public school districts, such exposure would interfere with the state's plenary power and duty, exercised at the local level by the individual districts, to provide the free public education mandated by the Constitution." (*Id.* at p. 1193.)

We therefore conclude, for all the reasons we have discussed, that Education Code section 201, as amended, does not establish that our state school districts are business establishments under the Unruh Act.

### Civil Code Section 51, Subdivision (f) of the Unruh Act

Petitioner alternatively maintains that even if a public school district is *not* a business establishment under the Unruh Act, it nevertheless can be sued for disability discrimination under the Act by virtue of Civil Code section 51, subdivision (f). Petitioner reads this subdivision to mean any violation of the ADA by any person or entity is also a violation of the Act. We conclude Civil Code section 51, subdivision (f) makes explicit that any violation of the ADA *by a business establishment* is also a violation of the Unruh Act.

Before discussing the statutory language at issue, we turn momentarily to the ADA, to point out it is comprised of three titles. Title I prohibits disability discrimination in employment. (42 U.S.C. § 12111 et seq.) Title II prohibits discrimination by public entities, including public schools. (42 U.S.C. §§ 12131 et seq, 12131, subd. (1)(B).) Title III—entitled "Public Accommodations and Services Operated By Private Entities"—prohibits disability discrimination by private persons and entities offering "public

43

accommodation[s]" and services. (42 U.S.C. §§ 12181 et seq., 12182, subd. (a).[11])

Returning to the Unruh Act, the language at issue was added to the statute in 1992 as part of omnibus legislation amending dozens of statutes to make them consistent with the ADA, then about to go into effect. (E.g., Assem. Com. on Judiciary, Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Jan. 6, 1992, p. 2 [bill "seeks to conform state law with the provisions of the ADA"; it "intends to strengthen California law where it is weaker than the ADA" and "[m]odify the language contained in state anti-discrimination laws to ensure that the protections are given to individuals with physical or mental disabilities," underscoring omitted]; Assem. Ways. & Means Com., Analysis of Assem. Bill No. 1077 (1991-1992 Reg. Sess.) as amended Jan. 1, 1992, p. 1 [bill "generally places protections afforded the disabled under the ADA into state law"].)

For virtually the entire time the bill was moving through the legislature, the pertinent language stated: "A violation of the right of any individual under the Americans With Disabilities Act of 1990 (Public Law 101-336) with respect to public accommodations subject thereto shall also

_____

[11] Title III includes a long list of "[p]ublic accommodation[s]." (42 U.S.C § 12181, subd. (7) [the "following *private* entities are considered public accommodations," italics added].) These include, for example: "an inn, hotel, motel, or other place of lodging," "a restaurant, bar, or other establishment serving food or drink," "a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment," "a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment," "a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation," etc. (*Id.* § 12181, subd. (7)(A)–(C), (E), (L).) Also included in this list of private entities is "a nursery, elementary, secondary, undergraduate, or postgraduate *private* school, or other place of education." (*Id.,* subd. (7)(J), italics added.)

constitute a violation of this section." (Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Apr. 18, 1991, § 2, pp. 8–9.) The Unruh Act was not broken into subdivisions at the time, but rather was set forth as a whole in several paragraphs, the proposed language appearing as the final paragraph of the statute. (*Ibid.*) Committee reports and analyses described this proposed addition to the Act as follows: "In regard to the Unruh Civil Rights Act [the bill will:] [¶] 3) Include persons with mental disabilities in the enumerated classes of individuals protected by the Unruh Act. [¶] 4) Make a violation of the ADA a violation of the Unruh Act. Thereby providing persons injured by a violation of the ADA with the remedies provided by the Unruh Act (e.g., right of private action for damages)." (Assem. Com. on Judiciary, Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Jan. 6, 1992, p. 2, underscoring omitted; accord Assem. Com. on Transportation, 3d reading of Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Jan. 29, 1992, p. 1.)

The proposed language continued unchanged from its initial inclusion in the bill in April 1991 until the next to final round of amendments on July 6, 1992. (Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Apr. 18, 1991, § 2; Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended July 6, 1992, § 3.) At this time, the language was shortened to read as it currently does: "A violation of the right of any individual under the Americans with Disability Act of 1990 (Public Law 101-336) shall also constitute a violation of this section." (Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended July 6, 1992, § 3.) The language remained situated as the final paragraph of the multi-paragraphed statute. (*Ibid.*)[12] The description of the language in committee reports and bill analyses also remained exactly as before. (E.g.,

_____

[12] The language was not placed in a separate subdivision, unchanged, until 2000. (Civ. Code, § 51, Stats. 2000, ch. 1049, § 2.)

45

Conc. in Sen. Amends., Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Aug. 29, 1992, p. 1; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Aug. 29, 1992, p. 2; State and Consumer Services Agency, Enrolled Bill Report on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) at p. 2.)  A supplemental analysis prepared by the Transportation Committee stated the July 6 amendment made "numerous, mostly technical changes."  (Business, Transportation & Housing Agency, Supp. Analysis on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended July 6, 1992, p. 1.)

In short, not a single committee report or bill analysis prepared after the final amendment shortening the proposed language, suggested this final amendment profoundly changed the substantive reach of the Unruh Act and that as to disability discrimination (and only disability discrimination) the Act was now disconnected from discrimination by business establishments. On the contrary, subsequent reports and analyses continued to describe the Unruh Act as prohibiting discrimination by business establishments.  For example, the Senate Third Reading Analysis stated:  "Existing provisions of the Unruh Civil Rights Act and related provisions, with certain exceptions, prohibit various types of discrimination by business establishments and franchisors, and in written instruments relating to real property, including discrimination on the basis of blindness and other physical disability.  [¶] This bill would make a violation of the American with Disabilities Act of 1990 also a violation of the Unruh Civil Rights Act, and would expand the express coverage of that act and related provisions to include discrimination on account of any disability."  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Aug. 29, 1992, at p. 2.)  The Enrolled Bill Report by the Department of

46

Rehabilitation similarly explained: The ADA "prohibits employment discrimination against individuals with physical or mental disabilities. It broadens the public transportation and public accommodation rights of individuals with disabilities." "In regard to the UNRUH CIVIL RIGHTS ACT: [¶] [The bill] [a]dds persons with mental and developmental disabilities as a protected class." "In regard to PUBLIC ACCOMMODATION/SERVICE/TRANSPORTATION: [¶] Provide[s] 'full and equal access' to anyone with a disability, as other members of the general public, to places of public accommodation and modes of transportation to which the general public is invited. [¶] . . . [¶] Expands the definition of public accommodations and full and equal access in Civil Code to conform to the ADA definition." (Health & Welfare Agency, Depart. of Rehabilitation, Enrolled Bill Report on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) pp. 2–3; accord Business, Transportation & Housing Agency, Dept. of Commerce Enrolled Bill Rep. on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) p. 2 ["Employers[13] and providers of public accommodations or services will be required to comply with both the ADA and state laws and regulations."].)

We thus see no indication the Legislature intended, as to disability discrimination only, to transform the Unruh Act into a general anti-discrimination statute making any violation of the ADA by any person or entity a violation of the Act. On the contrary, throughout the legislative process, the Unruh Act was consistently described as prohibiting discrimination *by business establishments*. (E.g., Sen. Rules Com., Off. of

---

[13] Many of the statutes comprising the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) were also amended as part of this omnibus legislation to make its employment antidiscrimination provisions consistent with the ADA. (Legis. Counsel's Dig., Assem. Bill No. 1077 (1991–1992 Reg. Sess.) 1992 Stats. ch. 913, subd. (15), p. 380.)

47

Sen. Floor Analyses, 3d reading analysis on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Aug. 29, 1992, at p. 2 [Unruh Act prohibits "various types of discrimination by business establishments"], Sen. Com. on Judiciary, Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended June 1, 1992, at p. 5 ["Unruh Civil Rights Act, entitles protected groups, including blind and physically disabled persons, to full and equal accommodation, advantages, facilities, privileges, or services in all business establishments"; "bill would include persons with mental disabilities in the enumerated classes of individuals protected by the Unruh Act"].)

Even as shortened in the final round of technical amendments, the language at issue does not state that a violation of the ADA *by* any person or entity is a violation of the Unruh Act. Rather, it states "[a] violation of the right of any individual under the [ADA]" shall "constitute a violation of [the Unruh Act]"—the question thus being, a violation *by* whom? We think it is apparent from both the Act as a whole and the legislative history of the language in question, that it is a violation *by a business establishment*.

Moreover, plaintiff's interpretation would effectively render superfluous amendments made by this same legislation to *other* anti-discrimination statutes—notably the FEHA. Under plaintiff's construct, that "any" violation of the ADA is a violation of the Unruh Act, a violation of Title I of the ADA, prohibiting disability discrimination in employment, would also be a violation of the Unruh Act. However, the Legislature incorporated the protections of Title I of the ADA into our state law by specifically amending numerous provisions of the FEHA. (Legis. Counsel's Dig., Assem. Bill No. 1077 (1991–1992 Reg. Sess.) 1992 Stats. ch. 913, subd. (15), p. 380.) Under statutory construction principles, we do not construe legislative acts as meaningless surplusage. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1010

["interpretations that render statutory terms meaningless as surplusage are to be avoided"].)

In addition, our Supreme Court had already held in *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493 (*Alcorn*), that the Unruh Act does *not* apply to "employment" discrimination. The court explained: "Although this court has held that the term 'business establishments' in [Civil Code] section 51 was used in the 'broadest sense reasonably possible' (*Burks* [,*supra*,] 57 Cal.2d 463, 468–469 . . . ), it is doubtful that the Legislature intended these sections to apply to discrimination in employment. The broad language of [Civil Code] section 51 was adopted after several court decisions placed an unduly restrictive interpretation upon the former phrase 'places of public accommodation or amusement' in the predecessor section to section 51. [Citation.] However, there is no indication that the Legislature intended to broaden the scope of [Civil Code] section 51 to include discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers." (*Alcorn,* at p. 500, citing Horowitz, *supra,* 33 So.Cal.L.Rev. at pp. 272–276, 288–289, 294.) The court went on to add that its conclusion was "substantiated by the fact that at the same session wherein it adopted the language of [Civil Code] section 51, the Legislature also enacted extensive provisions governing discrimination in employment. . . . [¶] Although the [FEHA] cannot be deemed to have repealed any provisions of the Civil Rights Act . . . , we conclude that the concurrent enactment of the former act indicated a legislative intent to exclude the subject of discrimination in employment from the latter act." (*Alcorn,* at p. 500.)

49

Our high court's observations and holding in *Alcorn* are equally apropos to the 1992 legislation that amended *both* the Unruh Act and the FEHA.

Petitioner impliedly acknowledges that *Alcorn's* holding—that the Unruh Act does not apply to discrimination by employers—refutes his assertion that any violation of the ADA is also a violation the Unruh Act, since Title I of the ADA prohibits discrimination in employment. He points out, however, *Alcorn* was decided prior to the 1992 amendment and suggests the case was legislatively overruled. There is not the faintest suggestion in the legislative history, however, that the Legislature intended to overrule *Alcorn*, as well as other cases by our Supreme Court following it. (E.g., *Rojo v. Kliger* (1990) 52 Cal.3d 65, 77 ["the Unruh Civil Rights Act has no application to employment discrimination"]; *Isbister, supra,* 40 Cal.3d at p. 83, fn. 12 ["the *employer-employee* relationship was not covered by the Act, which was confined to discriminations against recipients of the 'business establishment's . . . goods, services or facilities' "].) Accordingly, the controlling principle of statutory construction here is that the Legislature is deemed to have been aware of this existing law and to have enacted legislation consistent therewith. (See *People v. Castillolopez* (2016) 63 Cal.4th 322, 331.) Indeed, no subsequent case has ever suggested *Alcorn* was overruled by statute and is no longer controlling as to the scope of the Unruh Act. (See *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 391, 393–394 [generally discussing *Alcorn* and emphasizing it applies to the employer-employee relationship, and concluding the case did not apply to a person who sought to establish a relationship with a professional services agency but was allegedly rebuffed due to age discrimination].)

Our conclusion that Civil Code section 51, subdivision (f) makes any violation of the ADA by a business establishment a violation of the Unruh Act, is also consistent with our high court's more recent decisions addressing the interplay of the Act and the ADA.

In *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661 (*Munson*), the court addressed a question certified to it by the Ninth Circuit—whether an access claim by a wheelchair bound patron against a restaurant based on Title III of the ADA (the title applicable to "public accommodations") and brought under the Unruh Act pursuant to Civil Code section 51, subdivision (f), required a showing of intentional discrimination, otherwise required under the Act, but not required in an ADA Title III access case. (*Id.* at pp. 664–666.)

The high court first reiterated the "purpose" of the Unruh Act—to " 'create and preserve a nondiscriminatory environment in California business establishments by "banishing" or "eradicating" arbitrary, invidious discrimination by such establishments.' " (*Munson, supra,* 46 Cal.4th at p. 666; see *id.*, at p. 667 [the Act "has always provided substantive protection against invidious discrimination in public accommodations, without specifying remedies, and [Civil Code] section 52 has always provided remedies, including a private action for damages, for violations of [Civil Code] section 51."].)

It then explained that in 1992, the Legislature amended the Act "to, among other changes, add the paragraph that became [Civil Code section 51,] subdivision (f), specifying that '[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101–336) shall also constitute a violation of this section.' (Stats.1992, ch. 913, § 3, p. 4283, 4284. . . .) This amendment was but one part of a broad enactment, originating as Assembly Bill No. 1077 (1991–1992 Reg. Sess.), that sought to

51

conform many aspects of California law relating to disability discrimination (in employment, government services, transportation, and communications, as well as public accommodations) to the recently enacted ADA, which was soon to go into effect. (See Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Jan. 6, 1992, pp. 1–4 [digest] (hereafter Assembly Judiciary Report on Assembly Bill No. 1077).) . . . [¶] The Assembly Judiciary Report on Assembly Bill No. 1077 summarized the bill's changes to the Unruh Civil Rights Act as follows: 'Include persons with mental disabilities in the enumerated classes of individuals protected by the Unruh Act. [¶] . . . Make a violation of the ADA a violation of the Unruh Act. Thereby providing persons injured by a violation of the ADA with the remedies provided by the Unruh Act (e.g., right of private action for damages).' (Assem. Judiciary Rep. on Assem. Bill No. 1077, *supra,* at p. 2.)"[14] (*Munson, supra*, 46 Cal.4th at pp. 668–669.)

The court went on to explain, "[t]he ADA's public accommodations provisions are contained in title III of that law (42 U.S.C. §§ 12181–12189). This part of the ADA prohibits, among other things, the 'failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable' (42 U.S.C. § 12182(b)(2)(A)(iv))," and "[i]ntentional discrimination need not be shown to establish a violation of the ADA's access requirements." (*Munson, supra,* 46 Cal.4th at p. 669, fn. omitted.)

---

[14] As we have discussed, at this point in the legislative process, as throughout nearly the entirety of the process, the proposed language included the phrase "a violation of the right of any individual under the [ADA] . . . with respect to public accommodations subject thereto. . . ." (Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Apr. 18, 1991, § 2; Assem. Bill No 1077 (1991–1992 Reg. Sess.) as amended July 6, 1992, § 3.)

The court concluded a plaintiff proceeding under Civil Code section 51, subdivision (f) of the Unruh Act can recover statutory damages on proof of an ADA access violation without the need to demonstrate the discrimination was intentional. "Subdivision (f) . . . does not distinguish between those ADA violations involving intentional discrimination and those resulting, in the words of the federal law, from 'the discriminatory effects of architectural, transportation, and communication barriers' and the 'failure to make modifications to existing facilities.' (42 U.S.C. § 12101(a)(5).) . . . A reasonable interpretation of section 51, subdivision (f) is, therefore, that it, together with section 52, authorizes a private action for damages for ADA violations without proof of intentional discrimination." (*Munson, supra,* 46 Cal.4th at p. 670.) "The ADA, as explained above, permits a disabled individual denied access to public accommodations to recover damages in a government enforcement action only, not through a private action by the aggrieved person. But by incorporating the ADA into the Unruh Civil Rights Act, California's own civil rights law *covering public accommodations*, which does provide for such a private damages action, the Legislature has afforded this remedy to persons injured by a violation of the ADA." (*Id.* at p. 673, italics added.)

The Supreme Court's discussion in *Munson* of Civil Code section 51, subdivision (f) tracks exactly what we have discerned from the Unruh Act in its entirety and the legislative history of the 1992 amendment—that the Act has always been, and remains, a business establishment statute, and that it is violations of the ADA *by* business establishments (or, as denominated by the ADA, "public accommodations") that are actionable as violations of the Unruh Act under Civil Code section 51, subdivision (f).

In *Jankey v. Lee* (2012) 55 Cal.4th 1038 (*Jankey*), our high court considered whether a small grocer who prevailed in a disability access case was entitled to statutory attorney fees under the state's Disabled Persons Act (DPA) (Civ. Code, § 54). The court concluded he was. What is of interest in the instant case is the court's discussion of the Unruh Act and the DPA—the "[t]wo overlapping laws" that "are the principal sources of state disability access protection." (*Jankey,* at p. 1044.)

"The Unruh Civil Rights Act," said the court, "broadly outlaws arbitrary discrimination in *public accommodations* and includes disability as one among many prohibited bases. ([Civ. Code,] § 51, subd. (b).) As part of the 1992 reformation of state disability law, the Legislature amended the [Act] to incorporate by reference the ADA, making violations of the ADA per se violations of the . . . Act. ([Civ. Code,] § 51, subd. (f); *Munson* [,*supra,*] 46 Cal.4th at pp. 668–669.) This amendment was intended to extend to disabled individuals aggrieved by an ADA violation the full panoply of Unruh Civil Rights Act remedies. (*Munson,* at p. 673.) These include injunctive relief, actual damages (and in some cases as much as treble damages), and a minimum statutory award of $4,000 per violation. ([Civ. Code,] § 52, subds. (a), (c)(3).)" (*Jankey, supra,* 55 Cal.4th at p. 1044, italics added.)

The DPA "substantially overlaps with and complements" the Unruh Act. (*Jankey, supra,* 55 Cal.4th at p. 1044.) It is, however, "[m]ore narrow in focus" than the Unruh Act and "generally guarantees people with disabilities equal rights of access 'to public places, buildings, facilities and services, as well as common carriers, housing and places of public accommodation.' " (*Ibid.*, quoting *Munson, supra*, 46 Cal.4th at p. 674, fn. 8.) "As with" the Unruh Act, "the Legislature amended the [DPA] to incorporate ADA violations and make them a basis for relief under the act. ([Civ. Code,] §§ 54,

subd. (c), 54.1, subd. (d). . . .)  The available remedies include actual damages (and in some cases as much as treble damages), with a $1,000 minimum recovery.  ([*Id.*] § 54.3, subd. (a). . . .)  Recognizing the overlap between the Unruh Civil Rights Act and the [DPA], the Legislature expressly foreclosed double recovery.  ([*Id.*] § 54.3, subd. (c). . . .)"  (*Jankey,* at pp. 1044–1045, citing *Munson,* at p. 675.)

Thus, *Jankey,* like *Munson*, was a business establishment case.  And the court in *Jankey*, as it had in *Munson,* described the Unruh Act as prohibiting "business establishments" from engaging in invidious discrimination and described the significance of Civil Code section 51, subdivision (f) as making ADA violations a basis for relief under the Act.  It was in *this* context that the court commented the 1992 amendment made violations of the ADA "per se violations" of the Unruh Act.  And, indeed, the amendment did so—as to violations of the ADA *by business establishments.* By no means, however, can the court's per se comment be stretched into a holding that a violation of the ADA by *any* person or entity is a violation of the Unruh Act, regardless of whether they are a business establishment.

In urging otherwise, petitioner relies on a line of federal cases that have allowed disability discrimination claims against government entities under Title II of the ADA to proceed concurrently as Unruh Act claims, the theory being Civil Code section 51, subdivision (f) makes "any" violation of the ADA a "per se" violation of the Unruh Act and the Act has thus "adopted the full expanse of the ADA." (*Presta v. Peninsula Corridor Joint Powers Bd.* (N.D. Cal. 1998) 16 F.Supp.2d 1134, 1135; see, e.g., *Cohen v. City of Culver City* (9th Cir. 2014) 754 F.3d 690, 701 (*Cohen*)[15]; *K.M. ex rel. Bright v. Tustin*

---

[15]  The entirety of the circuit court's analysis of the Unruh Act claim was as follows:  "A violation of the ADA constitutes a violation of the

*Unified School Dist.* (9th Cir. 2013) 725 F.3d 1088, 1094, fn. 1 (*K.M.*)[16]; *Wagon v. Rocklin Unified School District* (E.D. Cal. 2019) 2019 WL 2577336;[17] *Ware v. Antelope Valley Union High School District* (C.D. Cal. 2018), 2018 WL 6017026 *9; *C.S. v. Public Safety Academy of San Bernardino* (C.D. Cal., 2014) 2014 WL 12591181, *5.)

None of these cases examined the legislative history of the language of Civil Code section 51, subdivision (f) in any depth.  Nor did they consider in any meaningful way our Supreme Court's discussion in *Munson* and *Jankey* of the import and significance of this language, or the context in which the

---

California DPA. Cal. Civ. Code, § 54.1(d).  Similarly, a violation of the ADA constitutes a violation of the Unruh Act.  Cal. Civ. Code, § 51(f); see *Munson v. Del Taco, Inc.,* 46 Cal.4th 661 . . . (holding that no showing of intentional discrimination is required to state an Unruh Act claim on the basis of an ADA violation).  Because the City is not entitled to summary judgment on Cohen's ADA claim, the district court erred by granting summary judgment for the City on Cohen's claims under the DPA and the Unruh Act." (*Cohen, supra,* 754 F.3d at p. 701.)

[16] The entirety of the circuit court's reasoning appeared in a footnote, stating: "Under California law, 'a violation of the ADA is, *per se,* a violation of the Unruh Act.' *Lentini v. Calif. Ctr. for the Arts,* 370 F.3d 837, 847 (9th Cir. 2004). We therefore do not discuss K.M.'s Unruh Act claim separately from her ADA claim." (*K.M., supra,* 725 F.3d at p. 1094, fn. 1.)  *Lentini,* however, was a business establishment case brought by a wheelchair bound patron who asserted claims under *Title III* of the ADA and the Unruh Act. (*Lentini v. Calif. Ctr. for the Arts,* at pp. 840–841.)

[17] The school district challenged only the adequacy of the plaintiff's showing on the merits of his state law claims. (*Wagon, supra,* 2019 WL 2577336 at *5.)  Thus, all the district court said in passing as to the applicability of the Unruh Act was: "In the disability context, California's Unruh Civil Rights Act operates virtually identically to the ADA. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007). Thus, any violation of the ADA necessarily constitutes a violation of the Unruh Act. *Id.*" (*Wagon,* at *5.)  *Molski,* however, was another business establishment case, by a patron against a restaurant. (*Molski v. M.J. Cable, Inc.*, at p. 727.)

high court examined this language—namely, in addressing the Unruh Act's prohibition against discrimination *by business establishments*. Finally, none of these federal court cases took account of our high court's decisions in *Alcorn* and *Rojo* holding employment discrimination claims are not actionable under the Unruh Act, which per force forecloses employment discrimination claims based on Title I of the ADA and thus eviscerates the premise "any" violation of the ADA is a violation of the Unruh Act.

Indeed, in marked contrast to the line of cases on which petitioner relies, the circuit court panel in *Bass v. County of Butte* (9th Cir. 2006) 458 F.3d 978 (*Bass*), undertook a thorough examination of each of the areas of inquiry as to which the analyses in the other cases are profoundly deficient. Acknowledging *Alcorn* and *Rojo,* the *Bass* court concluded employment claims asserted under Title I of the ADA cannot be brought under the Unruh Act. (*Id.* at pp. 981–982.) The court squarely rejected the plaintiff's claim that under Civil Code section 51, subdivision (f) of the Act and a like provision of the DPA, any violation of the ADA is "per se" a violation of these statutes. (*Id.* at pp. 981–983.)

With respect to the plaintiff's reliance on the language added to these statutes in 1992 and 1996, respectively, the court stated plaintiff's construction was "incompatible with the state's statutory scheme as a whole and is unsupported by the legislative history of the amendments." (*Bass, supra,* 458 F.3d at p. 981.) The plaintiff's assertion that the "plain meaning" of the amendments required "incorporation of the ADA in its entirety into the Unruh Act and the DPA," (italics omitted) said the court, would "transform[] the subject-matter scope of these statutes, *drastically broadening their reach from public accommodations* to employment discrimination. (*Ibid.*, italics added.) The language could "not . . . be interpreted in isolation," but had to

57

be considered in light of " 'the entire substance of the statute.' " (*Id.* at p. 982.) And bringing that perspective to bear, "the context of the 1992 amendment leads" to the conclusion "the California legislature intended to incorporate into the Unruh Act and the DPA only those provisions of the ADA germane to *the original scope of those state laws*." (*Ibid.*, italics added.) The plaintiff's reading "would, in effect, add to the text that a violation of an individual's right under *any part of* the ADA shall constitute a state-law violation as well, even if the subject matter of the alleged ADA violation is wholly outside the state-law protection at issue. The text of the amendments does not sweep so broadly." (*Ibid.*)

The *Bass* court went on to point out the legislation adding the reference to the ADA "was a broad-spectrum enactment that amended a number of state laws in an attempt to create conformity between the gamut of California's discrimination provisions and those of the ADA. Notably, the bill also amended FEHA, in an attempt to harmonize the state's employment discrimination protections with parallel federal mandates. A.B. 1077, 1992 Reg. Sess. (Cal.1992). If, as Plaintiffs argue, the legislature intended to transform the Unruh Act into an all-inclusive anti-discrimination law, then its simultaneous strengthening of FEHA would have been unnecessary and anomalous." (*Bass, supra,* 458 F.3d at p. 982.) Further, construing the language as a wholesale incorporation of the ADA into the Unruh Act and DPA would "create a significant disharmony" with FEHA's administrative scheme. In short, it would "create an end-run around the administrative procedures of FEHA *solely for disability discrimination claimants*." (*Id.* at p. 982.) Nothing supported such a result. (*Ibid.*)

Citing *Bass,* the district court in *Anderson, supra,* 2010 WL 3619821, in addition to concluding the county was not a business establishment under the

58

Unruh Act, went on to reject the plaintiff's assertion that her Title II ADA claim could nevertheless proceed against the county as an Unruh Act claim pursuant to Civil Code section 51, subdivision (f). "[I]n enacting [section] 51(f), the California Legislature did not purport incorporate the ADA in its entirety to the Unruh Act. See *Bass, supra,* 458 F.3d 978, 981 (9th Cir.2006). Rather, the legislature only intended to incorporate those provisions of the ADA germane to the *original scope of the Unruh Act. (Id.)*" (*Anderson,* at p. *6.) The Unruh Act, said the district court, "applies specifically to 'business establishments.' Cal. Civ. Code, § 51(b)." (*Anderson,* at * 6.) "To conclude that a jail is governed by the Unruh Act, notwithstanding the fact that it lacks the attributes of a business, would amount to an impermissible expansion of the statute." (*Ibid.*)

For all the reasons we have discussed, *Bass* and *Anderson,* in our view, have correctly analyzed Civil Code section 51, subdivision (f)—that it expressly makes any violation of the ADA *by a business establishment* a violation of the Unruh Act.

## DISPOSITION

The petition for a writ of mandate seeking to overturn the trial court's order sustaining the school district's demurrer to his Unruh Act claim without leave to amend, is DENIED. Parties to bear their own costs.

_____

Banke, J.

We concur:

_____

Margulies, Acting P.J.

_____

Sanchez, J.

A157026, Brennon B.

60

Trial Court:Contra Costa County Superior Court

Trial Judge:      Hon. Charles S. Treat

Counsel:

Liberty Law Office and Micha Star Liberty for Petitioner.

Consumer Attorneys of California and Alan Charles Dell'Ario as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Edington Schirmer & Murphy, Timothy Patrick Murphy and Cody Lee Saal for Real Party in Interest.

Sue Ann Salmon, Dannis Woliver Kelley, and David A. Obrand; The Education Legal Alliance of the California School Boards Association and Kathryn Elizabeth Meola, as Amicus Curiae on behalf of Real Party in Interest.